**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| STATESIDE BRANDS LLC, | |
| Plaintiff, | |
| v. | Case No. 2:25-cv-06017-MAK |
| ANHEUSER-BUSCH, LLC and ANHEUSER-BUSCH INBEV WORLDWIDE INC., | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ....................................................................................................1

II.     SUMMARY OF UNDISPUTED FACTS ...........................................................3

      A.      Stateside and its Surfside Trade Dress. ..................................................3

      B.      AB and its infringing Skimmers can design. .........................................5

      C.      The parties' overlapping marketing, trade channels, and target customers. ...............6

      D.      The actual confusion caused by the Skimmers Can Design. .................7

III.    LEGAL STANDARD ............................................................................................8

IV.     ARGUMENT .........................................................................................................8

      A.      Stateside's Surfside Trade Dress is distinctive. ....................................9

            1.      The Surfside Trade Dress is inherently distinctive. .................9

            2.      The Surfside Trade Dress has acquired secondary meaning. ...........12

      B.      The Surfside Trade Dress is non-functional. .......................................15

      C.      A likelihood of confusion exists between the parties' can designs. .............16

            1.      The parties' can designs are similar. ........................................17

            2.      The parties' products are identical and are distributed through the same channels of trade. ..................20

            3.      Stateside and AB advertise through the same channels. ...............20

            4.      The Surfside Trade Dress is strong. .........................................21

            5.      Consumers are not sophisticated and exercise minimal care when purchasing the parties' products. ...................22

            6.      Actual confusion has already arisen. ........................................23

            7.      AB created the Skimmers can design with the intent to copy the Surfside Trade Dress and confuse consumers. ...................24

            8.      On balance, each *Lapp* factor favors likely confusion. .................25

V.    CONCLUSION..................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Bev. Corp. v. Diageo N. Am., Inc.*,
   936 F. Supp. 2d 555, 598-600 (W.D. Pa. 2013) ............................................................ *passim*

*A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*,
   237 F.3d 198 (3d Cir. 2000)....................................................................................16, 17

*Abercrombie & Fitch Co. v. Hunting World, Inc.*,
   537 F.2d 4 (2d Cir. 1976)..............................................................................................9

*Acxiom Corp. v. Axiom, Inc.*,
   27 F. Supp. 2d 478 (D. Del. 1998)..............................................................17, 20, 24

*Alfred Dunhill of London, Inc. v. Kasser Distillers Prods. Corp.*,
   350 F. Supp. 1341 (E.D. Pa. 1972) ...............................................................................20

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)......................................................................................................8

*Century 21 Real Estate Corp. v. Lendingtree, Inc.*,
   425 F.3d 211 (3d Cir. 2005)........................................................................................22

*Checkpoint Sys., Inc. v. Check Point Soft. Techs., Inc.*,
   269 F.3d 270 (3d Cir. 2001)................................................................17, 18, 20, 23

*Ciba-Geigy Corp. v. Bolar Pharm. Co.*,
   547 F. Supp. 1095 (D.N.J. 1982) ...............................................................................14

*Coach, Inc. v. Bag Place, Co.*,
   No. 10-6226, 2012 WL 13028160 (D.N.J. May 7, 2012)..........................................8

*Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*,
   214 F.3d 432 (3d Cir. 2000)........................................................................................12

*Country Floors, Inc. v. P'ship Composed of Gepner and Ford*,
   930 F.2d 1056 (3d Cir. 1991)......................................................................................23

*Duraco Prods., Inc. v. Joy Plastic Enters., Ltd.*,
   40 F.3d 1431 (3d Cir. 1994)..........................................................................................8

*E.T. Browne Drug Co. v. Cococare Prods., Inc.*,
   538 F.3d 185 (3d Cir. 2008)........................................................................................12

*Eli Lilly & Co. v. Nat. Answers, Inc.*,
   233 F.3d 456 (7th Cir. 2000) ...............................................................................23

*Fisons Horticulture, Inc. v. Vigoro Indus.*,
   30 F.3d 466 (3d Cir. 1994)......................................................................20, 21, 23

*Gucci Am. Inc. v. Daffy's, Inc.*,
   354 F.3d 228 (3d Cir. 2003)...................................................................................17

*Ideal Toy Corp. v. Plawner Toy Mfg. Corp.*,
   685 F.2d 78 (3d Cir. 1982)....................................................................................15

*Interpace Corp. v. Lapp, Inc.*,
   721 F.2d 460 (3d Cir. 1983)..................................................................................17

*Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.*,
   456 U.S. 844 (1982)..........................................................................................9, 15

*Kaucher v. Cnty. of Bucks*,
   455 F.3d 418 (3d Cir. 2006)....................................................................................8

*Knorr-Nahrmittel A.G. v. Reese Finer Foods, Inc.*,
   695 F. Supp. 787 (D.N.J. 1988) ........................................................................8, 14

*Kos Pharms., Inc. v. Andrx Corp.*,
   369 F.3d 700 (3d Cir. 2004)..................................................................................23

*Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*,
   679 F.3d 410 (6th Cir. 2012) ................................................................................23

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)..................................................................................................8

*McNeil Nutritionals, LLC v. Heartland Sweeteners LLC (McNeil I)*,
   512 F. Supp. 2d 217 (E.D. Pa. 2007) ...................................................................21

*McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC (McNeil II)*,
   511 F.3d 350 (3d Cir. 2007)......................................................................16, 17, 25

*McNeil Nutritionals, LLC v. Heartland Sweeteners LLC (McNeil III)*,
   566 F. Supp. 2d 378 (E.D. Pa. 2008) ........................................................... *passim*

*Monroe v. Beard*,
   536 F.3d 198 (3d Cir. 2008)....................................................................................8

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer
   Pharmaceuticals Co.*,
   290 F.3d 578 (3d Cir. 2002)..................................................................................24

*Opticians Ass'n of Am. v. Indep. Opticians of Am.*,
   920 F.2d 187 (3d Cir. 1990) ................................................................................................18

*Paddington Corp. v. Attiki Imps. & Distribs., Inc.*,
   996 F.2d 577 (2d Cir. 1993) ............................................................................................9, 25

*Pearson v. Component Tech. Corp.*,
   247 F.3d 471 (3d Cir. 2001) .................................................................................................8

*Estate of Presley v. Russen*,
   513 F. Supp. 1339 (D.N.J. 1981) ........................................................................................20

*Qualitex Co. v. Jacobson Prods. Co.*,
   514 U.S. 159 (1995) ............................................................................................................15

*S&P Global Inc. v. S&P Data LLC*,
   619 F. Supp. 3d 445 (D. Del. 2022) ....................................................................................24

*Sabinsa Corp. v. Creative Compounds, LLC*,
   609 F.3d 175 (3d Cir. 2010) ...............................................................................................24

*Tetris Holding, LLC v. Xio Interactive, Inc.*,
   863 F. Supp. 2d 394 (D.N.J. 2012) .......................................................................................8

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
   505 U.S. 763 (1992) ..............................................................................................................9

*Versa Prods. Co. v. Bifold Co.*,
   50 F.3d 189 (3d Cir. 1995) ...............................................................................21, 22, 23, 24

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*,
   529 U.S. 205 (2000) ..........................................................................................9, 10, 11, 12

**Statutes**

15 U.S.C. § 1125(a) ....................................................................................................................25

**Other Authorities**

Fed. R. Civ. P. 56(c) ......................................................................................................................8

2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR
   COMPETITION, § 15:30 (5th ed.) .........................................................................................14

## I.    INTRODUCTION

The Court need look no further than the picture below to see that there are no genuine issues for trial in this trade dress case involving a market leader—Surfside—and its copycat—Skimmers.



In a crowded field of ready-to-drink ("RTD") cocktails, Stateside Brands LLC innovated something new that, in the words of Defendants ("AB"), "pioneered" a new market segment: Surfside, an RTD vodka-based tea/lemonade drink. Through determination and hard work, Stateside built Surfside into a nationwide powerhouse—with more than ███████ market sh███

and recognition as "the fastest-growing alcohol brand in America." The dress for that success is embodied in Surfside's unique can design, with (1) layered color-shifting bands in the bottom third of the can, (2) a white background overlaid with a sun design and product mark in the top two-thirds, and (3) a colored top rim drawn from the bottom color scheme (the "Surfside Trade Dress").



AB recognized Surfside's meteoric rise, ███████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

1



██████████████████ AB eventually got what it asked for: a Skimmers can with the same core architecture as Surfside—a colored top rim, predominantly white background, sun logo overlaid with the brand name, and colorful gradient bands at the bottom.



Other than to free-ride off what Stateside built in its blockbuster product, there's no legitimate need to make a can that copies these elements. A throwback to 70's surfer culture, the Surfside Trade Dress is Stateside's source identifier and badge of honor. The design is not needed to sell a canned cocktail—███████████—nor is it an industry norm. This is obvious from the many alternative designs that line store shelves and, unlike Skimmers, compete on their own merit, with their own identities.

It is undisputed that Surfside and Skimmers are the same kind of product, advertised the same way, sold to the same consumers, through the same retailers and channels, at similar low price points, often side-by-side on store shelves. AB even mandated that ████████████████ ██████████████████████ In that low-cost, grab-and-go retail environment, the

2

law recognizes what common sense says: consumers exercise little care, and similar packaging is especially likely to confuse.

Confusion is not hypothetical. A Philadelphia Magazine reporter "honestly thought they were the same products at first glance"; a consumer admitted buying Skimmers because they "thought it was stateside"; a Las Vegas bar ordered Surfside but received Skimmers after distributor confusion. And many have commented on the undeniable similarities between the can designs, saying that they look "incredibly similar," are "eerily similar" with "a suspiciously similar package design," "are nearly indistinguishable," "look almost identical," and it is "[d]ifficult to see the difference, particularly from a difference on shelf." Queried one person: "[c]ould their [AB's] team have tried harder to come up with a #name, #branding, and #packaging that looked at least a little different? This is almost comical." These real-world reactions are powerful evidence of likely confusion, particularly because Skimmers has only been on the market for a short time and in limited distribution, with limited advertising.

Summary judgment is warranted because every material point moves in one direction. The Surfside Trade Dress is protectable because it is inherently distinctive, commercially strong, and non-functional. The Skimmers can design infringes because it creates the same overall commercial impression, appears on identical competing products in the same channels, is a "grab-and-go" product purchased with little care or deliberation, targets the same consumers, has already caused actual confusion, and was adopted with unmistakable evidence of copying. On this record, confusion is not merely likely; it is inevitable.

## II.    SUMMARY OF UNDISPUTED FACTS

Stateside incorporates by reference its Statement of Undisputed Material Facts ("SUMF") filed in support of its Motion for Summary Judgment, and provides a summary of those facts below.

### A.    Stateside and its Surfside Trade Dress.

Stateside is a successful, popular, and well-known Philadelphia-based distillery that makes and

sells several types of alcoholic beverages, namely, vodka, RTD vodka-soda cocktails, and RTD vodka-based tea and lemonade cocktails. SUMF ¶ 3. Stateside launched its vodka in 2015. *Id.* ¶ 5. To capitalize on the success of its vodka, and looking for ways to expand its product portfolio, Stateside made its first foray into the RTD beverage space by launching its Stateside Vodka Soda. *Id.* ¶ 6. Around the same time, Stateside also developed the concept for a different RTD vodka beverage containing tea and/or lemonade—Surfside. *Id.* ¶ 7.

First offered in Pennsylvania and Delaware in December 2021, Surfside was an overnight success, with sales growing by 220% in just its second year on the market. *Id.* ¶¶ 22, 32. In its first five years, Stateside expanded to all 50 states (and the District of Columbia and Caribbean) and earned nearly ███████████████████████. *Id.* ¶ 23, 32. Owing to its tremendous success, Surfside received numerous accolades, including the fastest-growing alcohol brand in the country. *Id.* ¶¶ 54-56. Starting with its iced tea and iced tea + lemonade flavors, Stateside expanded its product line to a wide range of other flavors. *Id.* ¶¶ 18-19.

Critical to its commercial success and tremendous popularity is Surfside's unique and highly identifiable can design, i.e., its "primary packaging," which features the three-part design embodied by the Surfside Trade Dress. *Id.* ¶¶ 9, 26-27, 44-52.

Stateside developed the Surfside Trade Dress based on 1970s Southern California surf culture, aiming to create a beach-inspired design. *Id.* ¶ 8. Stateside President Matt Quigley designed the color-shifting bands on the lower third of the can to evoke a sunset and added a colored rim around the top to create a 360-degree wraparound design that remains identifiable even when part of the can is obscured. *Id.* ¶¶ 11-12. Mr. Quigley conceived the sun design during a surfing trip and placed it against a white background, which contrasts with the other elements to create a memorable brand identity. *Id.* ¶¶ 13-14. Neither Stateside nor Mr. Quigley considered other beverage can designs when creating the trade dress, and Stateside was unaware of any RTD brand using a similar Southern California surf-

4

culture theme or can design. *Id.* ¶¶ 15-16. Over the years, Stateside has developed different iterations of its Surfside Trade Dress to match new flavors of its drink, each representing a variation on a sunset and each consistently applying the trade dress' foundational characteristics. *Id.* ¶¶ 19, 21.

Surfside has achieved substantial commercial success and marketplace recognition. *Id.* ¶¶ 28-57. Through April 2026, Stateside sold more than ███████ and more than 24 million cases nationwide. *Id.* ¶ 32. As of April 18, 2026, Surfside held a ████ share of the vodka-tea/lemonade RTD market and ███ of the overall RTD market. *Id.* ¶¶ 35-36. Forbes described Surfside as "America's fastest growing canned cocktail" in 2024 and later as "the fastest-growing alcohol brand in America," and AB's own internal documents recognized Surfside as a successful market leader. *Id.* ¶¶ 37, 54. Stateside has spent more than ███████ advertising Surfside since 2022, including through social media, point-of-sale materials, billboards, truck wraps, train wraps, aerial advertising, sports partnerships, and other out-of-home marketing. *Id.* ¶¶ 39-53. Stateside's advertising, and its Surfside merchandise, prominently and consistently feature the Surfside Trade Dress, including the Sunset Stripes, sometimes without the "Surfside" name. *Id.* ¶¶ 44-50. Stateside has even engaged in "look-for" advertising for its Surfside Trade Dress by running ads telling consumers to "look for the can with the Sunset Stripes." *Id.* ¶ 48.

## B.    AB and its infringing Skimmers can design.

AB is one of the world's largest beer companies. *Id.* ¶ 58. In 2019, AB expanded into the RTD canned cocktail space when it acquired Cutwater Spirits. *Id.* ¶ 59. Still, AB was late to conceptualize a vodka-based tea/lemonade RTD—a product segment pioneered by Stateside and its Surfside beverages. *See id.* ¶¶ 34, 96. ████████████████████████████████████████████ ███████████████████████. *Id.* ¶ 67.

5



. *Id.* ¶¶ 71-76.

. *Id.* ¶ 95.

*Id.* ¶¶ 73-74, 111.

. *Id.* ¶¶ 77-94.

. *Id.* ¶¶ 79-80.

. *Id.* ¶¶ 81-88.

. *Id.* ¶¶ 98-100.

. *Id.* ¶¶ 101-103.

*Id.* ¶¶ 75-76.

## C.    The parties' overlapping marketing, trade channels, and target customers.

Skimmers and Surfside are vodka-based RTD beverages mixed with tea and/or lemonade and

6

compete directly. *Id.* ¶¶ 7, 71-72. Both are sold through many of the same major retailers (e.g., Albertsons, BevMo!, Binny's, HyVee, Jewel Osco, Meijer, Safeway, Schnucks, Dierbergs, Total Wine, and Walmart) and other channels, such as bars, restaurants, and live events. *Id.* ¶¶ 113-117. Skimmers and Surfside are often placed side-by-side or near each other on retail shelves, ██████████

██████████████████████████████████████████████████████

██████████████████████████████ *Id.* ¶¶ 118-121. Skimmers and Surfside are also sold at similar low price points, with 4-packs of both available for as little as $9.99. *Id.* ¶¶ 28, 122. Moreover, AB advertises Skimmers in substantially the same manner as Stateside, e.g., on the Internet (including social media), on billboards and other physical signage, at the point of purchase, at major music and sports venues, ██████████████████████████████████████

████. *Id.* ¶¶ 39-43, 126-131. ████████████████████████████

██████████████████████████████████████ *Id.* ¶ 129. ██████

████████████████████████████████████. *Id.* ¶ 74.

### D.    The actual confusion caused by the Skimmers Can Design.

Even though Skimmers has only been on the market for around a year with limited geographic distribution and minimal marketing, Stateside has *already* uncovered multiple instances of actual confusion stemming from AB's infringing can design. *Id.* ¶¶ 107, 133, 138-142. For instance, a reporter from *Philadelphia Magazine* declared "honestly thought they were the same products at first glance." *Id.* ¶ 138. Similarly, in response to an Instagram post by *Philadelphia Magazine*, a user commented: "I actually bought the other ones [i.e., Skimmers] and thought it was stateside." *Id.* ¶ 139. Additionally, the owner of a Las Vegas bar/restaurant ordered Surfside from a distributor (that also works with AB) and instead received Skimmers from the distributor, who later indicated to Stateside's CEO Clement Pappas that its confusion caused the mix-up. *Id.* ¶¶ 140-141. Additionally, multiple others have commented on the similarity between the Surfside and Skimmers can designs. *Id.* ¶¶ 143-151.

### III.    LEGAL STANDARD

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 482 n. 1 (3d Cir. 2001) (*citing Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)); *accord* Fed. R. Civ. P. 56(c). To be material, a fact must have the ability to "affect the outcome of the suit under governing law." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *See Monroe v. Beard,* 536 F.3d 198, 206–07 (3d Cir. 2008).

Once the moving party demonstrates the absence of a genuine issue of material fact, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. *Celotex Corp.,* 477 U.S. at 323-24. And the nonmoving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Monroe*, 536 F.3d at 206 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

Summary judgement is appropriate in trade dress cases. *See e.g.*, *Tetris Holding, LLC v. Xio Interactive, Inc.*, 863 F. Supp. 2d 394, 416 (D.N.J. 2012) (granting plaintiff summary judgment, finding the manner in which defendant packaged and advertised its product was likely to cause confusion); *Knorr-Nahrmittel A.G. v. Reese Finer Foods, Inc.*, 695 F. Supp. 787, 788 (D.N.J. 1988) (granting plaintiff summary judgment, finding packaging was distinctive and non-functional); *Coach, Inc. v. Bag Place, Co.*, No. 10-6226, 2012 WL 13028160, at *6 (D.N.J. May 7, 2012) (granting plaintiff summary judgment).

### IV.    ARGUMENT

To establish infringement, Stateside must prove (i) the Surfside Trade Dress is distinctive and nonfunctional, and (ii) the Skimmers can is likely to cause consumer confusion. *See Duraco Prods., Inc. v. Joy Plastic Enters., Ltd.*, 40 F.3d 1431, 1439 (3d Cir. 1994). As shown below, the uncontested facts compel a finding that Stateside's Surfside Trade Dress is protectable, strong, and infringed by the

8

lookalike Skimmers can design.

### A.    Stateside's Surfside Trade Dress is distinctive.

The U.S. trademark law protects the overall image/appearance, or "trade dress," of products and/or their packaging. A product's "trade dress" may include features "such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 764 n.1 (1992). Trade dress "can be distinctive in one of two ways." *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000). It can be "inherently distinctive." *Id.* (citing *Two Pesos*, 505 U.S. at 768). Or it can acquire distinctiveness, "even if it is not inherently distinctive, if it has developed secondary meaning." *Id.* at 211 (citing *Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.*, 456 U.S. 844, 851 n.11 (1982)). Stateside need only show that the Surfside Trade Dress is *either* inherently distinctive *or* has acquired distinctiveness—it need not prove both. *See Two Pesos*, 505 U.S. at 769. Irrespective, both forms of distinctiveness exist here.

### 1.    The Surfside Trade Dress is inherently distinctive.

Trade dress is inherently distinctive if "[its] intrinsic nature serves to identify a particular source of a product." *Id.* at 768. "A product's packaging primarily serves the purpose of source identification." *McNeil Nutritionals, LLC v. Heartland Sweeteners LLC (McNeil III)*, 566 F. Supp. 2d 378, 387-88 (E.D. Pa. 2008) (citing *Wal-Mart Stores*, 529 U.S. at 210).

To assess inherent distinctiveness, this Court applies the test articulated in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 10-11 (2d Cir. 1976), adapted for the trade dress context. *See McNeil III*, 566 F. Supp. 2d at 388. Under that test, "a trade dress is classified in categories of increasing distinctiveness: generic, descriptive, suggestive, arbitrary or fanciful." *Id.* (citation omitted). As it relates to product packaging, "because 'the choices that a producer has for packaging its products are . . . almost unlimited, typically a trade dress will be arbitrary or fanciful and thus inherently distinctive.'" *Id.* (quoting *Paddington Corp. v. Attiki Imps. & Distribs., Inc.*, 996 F.2d 577, 583 (2d Cir. 1993)). That is

true even where the packaging may incorporate "descriptive or suggestive" design elements because the test "look[s] at the overall combination of the pictorial elements and the other non-pictorial elements," not the individual elements. *Id.* at 389.

For example, in *McNeil III*, the plaintiff asserted trade dress rights in its artificial sweetener packaging. 566 F. Supp. 2d at 389. Even though "many of the pictorial elements of the [asserted] trade dress [were] descriptive or suggestive" (e.g., a picture of a cup of coffee or iced tea), "[t]he combination of pictorial elements, colors, labeling, and layout (including the prominent placement of the product name surrounded by a distinctive white cloud) identify the products as originating with the makers of Splenda." *Id.*

Similarly, and particularly apt here, the court in *Am. Bev. Corp. v. Diageo N. Am., Inc.* found the packaging design for plaintiff's line of frozen RTD cocktails (shown below) inherently distinctive although "some of the elements [were] somewhat descriptive," e.g., the images of fruit corresponding to the flavor. 936 F. Supp. 2d 555, 598-600 (W.D. Pa. 2013).



As in *McNeil III* and *Am. Bev.*, the Surfside Trade Dress is inherently distinctive. First, it covers the beverage's *packaging*, namely, the can, which "primarily serves the purpose of source identification." *McNeil III*, 566 F. Supp. 2d at 388 (citing *Wal-Mart Stores*, 529 U.S. at 210).

Second, each individual element of the Surfside Trade Dress is arbitrary and fanciful. The horizontal gradient banding on the bottom third of the Surfside cans, along with a matching rim at

the top,[1] indicates *nothing* about the product other than its source, *i.e.*, Stateside. *See Am. Bev.*, 936 F. Supp. 2d at 599 (finding "swirl pattern in the central banding" of the design "arbitrary or fanciful" because it "does not indicate anything about the product"). So too for the white background overlayed with a sun design and the product trademark. *See id.* ("[t]he horizontal banding on the packaging, including the prominent placement of the Daily's trademark in black with silver lettering, *strongly indicates the source of the product*, i.e. ABC.") (emphasis added).

Third, the combination of the elements of the Surfside Trade Dress is inherently distinctive. Viewed as a whole, as it must be, the unique combination of text, images, and designs on the Surfside beverages serves to identify the source of that product, nothing more. *See McNeil III*, 566 F. Supp. 2d at 388-89 (finding product packaging trade dress inherently distinctive despite descriptive and suggestive nature of some elements); *Am. Bev.*, 936 F. Supp. 2d at 598-600 (same).

For its part, AB contends that Stateside *must* prove secondary meaning for the Surfside Trade Dress. The law says otherwise. While "a product's *design* [*i.e.*, configuration] is distinctive, and therefore protectable, only upon a showing of secondary meaning," *Wal-Mart Stores*, 529 U.S. at 216 (emphasis added), that is not so for a product's *packaging*—which can be, and often is, inherently distinctive. *See McNeil III*, 566 F. Supp. 2d at 388-98 (finding packaging inherently distinctive); *Am. Bev.*, 926 F. Supp. 2d at 598-600 (same). So too here.

AB further contends that the Surfside Trade Dress is not distinctive because its elements are purportedly common and widely used in the RTD beverage industry to signal product attributes, such as flavor, refreshment, and fun. *See* ECF No. 37 at 1-3. This argument also misunderstands the law. The inquiry is not whether each individual element is distinctive on its own; it is whether the overall

---

[1] While a colorful rim at the top of a can, without more, could serve to convey a certain flavor, the specific colors and design used by Stateside, as well as the decision to make the top rim match the color of the gradient at the bottom of the can, are arbitrary design choices that serve to identify Stateside as the source of its products. *See* SUMF ¶¶ 11-12.

combination of elements is distinctive. *See McNeil III*, 566 F. Supp. 2d at 389 ("we look at the overall combination of the pictorial elements and the other non-pictorial elements"; holding "overall combination of [plaintiff's] trade dress [was] arbitrary or fanciful" and thus distinctive.); *Am. Bev.*, 936 F. Supp. 2d at 600 ("Like the court of appeals in *McNeil Nutritionals* found, it is not the descriptive nature of the individual elements that must be considered, but the overall impression of the combination of those elements.").

The can designs AB identified in its Answer (ECF No. 37 at 2) and elsewhere, have no impact on the inherent distinctiveness of the Surfside Trade Dress because most bear *little to no resemblance* to the Surfside Trade Dress. Indeed, of the can designs AB identified, only *one* takes each and every element of the Surfside Trade Dress—Skimmers. SUMF ¶104. Ironically, AB's own evidence proves the point for Stateside: the Surfside Trade Dress "is not an industry custom such that [AB's] use of it precludes [a] finding that its trade dress is inherently distinctive." *McNeil III*, 566 F. Supp. 2d at 390; *see* SUMF ¶ 17 (Op. Pirko Rep. at 13).

### 2. The Surfside Trade Dress has acquired secondary meaning.

Given the inherent distinctiveness of the Surfside Trade Dress, Stateside need not prove acquired distinctiveness. It nevertheless can and has done so, including by the time of the Skimmers launch. "[Trade dress] [] acquire[s] distinctiveness . . . if it has developed secondary meaning," *i.e.*, when "in the minds of the public, the primary significance of the [trade dress] is to identify the source of the product rather than the product itself." *Wal-Mart Stores*, 529 U.S. at 211. (citation omitted). The Third Circuit considers the following non-exhaustive factors as a guide:

> (1) the extent of sales and advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of customers; and (11) actual confusion.

*E.T. Browne Drug Co. v. Cococare Prods., Inc.*, 538 F.3d 185, 199 (3d Cir. 2008) (citing *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 438 (3d Cir. 2000)). These factors overwhelmingly

favor secondary meaning.

Stateside has used its Surfside Trade Dress for five years. *See Am. Bev.*, 936 F. Supp. 2d at 602 (six years of use favored secondary meaning); *McNeil III*, 566 F. Supp. 2d at 392 (six years of use, even with minor changes, favored secondary meaning); SUMF ¶ 32. And over that period, the Surfside beverages have experienced extraordinary commercial success and growth. Stateside went from selling about 390,000 cases of Surfside in 2022, to 1.55 million cases in 2023, to 5.3 million cases in 2024, to 11.7 million cases in 2025—amounting to nearly ███████████████████████ in sales since launch through April 2026. *Id.*

These numbers are not just large in the abstract—they place Surfside as a definitive market and product-category leader, with a ████ share of the vodka-tea/lemonade market (i.e., the highest share in that market segment) and an ████ share of the overall RTD market as a whole (i.e., the third highest share in that market segment). *Id.* ¶¶ 35-36. Surfside was named "America's fastest growing canned cocktail" and "the fastest-growing alcohol brand in America" by *Forbes* in 2024 and 2025 respectively. *Id.* ¶ 54. And *Forbes* recently published another article recognizing the success of Surfside, titled "How RTD Brand Surfside Keeps Thriving as Americans Drink Less." *See id.* This explosive growth has landed Surfside atop of the industry, earning its place as the top-selling spirits brand by volume in the United States in 2025. And AB acknowledges that Stateside is, and has been, the market leader in the RTD vodka and lemonade/tea space. *Id.* ¶ 37.

Stateside has also extensively advertised its Surfside Trade Dress, spending ██████████ since 2022 in varied media, including the Internet, billboards, and other physical signage, including prominent in-store displays nationwide. *Id.* ¶¶ 39-53. Increasing exposure to its Surfside Trade Dress, Stateside has entered into partnerships with major professional sports teams, including the Philadelphia Phillies, Los Angeles Dodgers, San Francisco Giants, and Cleveland Cavaliers, among others. *Id.* ¶ 42.

Stateside also leverages its trade dress by consistently incorporating it in advertising, merchandise, and other packaging—all of which crystalize and reinforce a mental association between Stateside and its Surfside Trade Dress for millions. *Id.* ¶¶ 44-50. And the Stateside ads that tell people to "look for the can with the Sunset Stripes" are particularly effective in reinforcing secondary meaning. *See* 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 15:30 (5th ed.) ("When secondary meaning is alleged to exist in a nonword design or package or product shape, the use of 'look for' advertising and promotion can be very effective circumstantial evidence.").

Beyond its own advertising, Stateside's Surfside drinks have received significant unsolicited media attention from major business outlets, such as *CNN Business*, *INC. Magazine*, *AdAge*, *Men's Journal*, *Philly Voice*, and *InsideHook*, and industry publications, including *Food & Wine*, *RTD Ready-To-Drink Magazine*, *Beverage Daily*, *The Spirits Business*, *Beer Business Daily*, *Eat This, Not That!*, *FoodDive*, *VinePair*, and *Guilty Eats*. *See id.* ¶¶ 54-57.

All of this weighs heavily in favor of secondary meaning. *See McNeil III*, 566 F. Supp. 2d at 390-91 (finding secondary meaning in trade dress based on six years of use, $250 million spent on advertising, and significant growth); *Am. Bev.*, 936 F. Supp. 2d at 601 (finding secondary meaning in trade dress based on six years of use, $30 million in sales, significant growth, $10 million spent on advertising, and unsolicited media coverage).

Moreover, as noted, AB has not identified any third parties using all the elements comprising the Surfside Trade Dress other than Skimmers—which, as discussed below (*infra* Section IV.C.7), ███. SUMF ¶ 104. Stateside's exclusivity of use and AB's intentional copying further favor a finding of secondary meaning. *See Knorr-Nahrmittel A.G. v. Reese Finer Foods, Inc.*, 695 F. Supp. 787, 793 (D.N.J. 1988) ("[C]opying alone is sufficient to establish secondary meaning in a trade dress case.") (citations omitted); *Ciba-Geigy Corp. v. Bolar Pharm. Co.*, 547 F. Supp. 1095, 1113 (D.N.J. 1982) ("A product is generally considered to have acquired distinctiveness

14

and secondary meaning when its trade dress has been copied. This rule is based on the theory that one only copies something of value and would not copy the trade dress of a product if it does not afford some commercial gain.") *aff'd,* 719 F.2d 56 (3d Cir. 1983).

### B.    The Surfside Trade Dress is non-functional.

Stateside must also show that its Surfside Trade Dress is non-functional. "[A] product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.*, 456 U.S. 844, 850 n. 10. (1982). A feature may also be functional "if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (1995) (citing *Inwood Lab'ys,* 456 U.S. at 850 n. 10).

The Surfside Trade Dress is not essential to the use or purpose of its RTD drink, nor does it affect the drink's cost or quality. Any arguments otherwise strain credulity. The Surfside Trade Dress is comprised of various specifically defined design elements that convey a beach theme and, when taken together, form an arbitrary whole that serves as a strong source identifier. SUMF ¶¶ 9, 127. None of these elements—let alone the specific combination of them—are needed to create, market, or sell a competing product. *Id.* ¶¶ 98-103. Indeed, there are countless ways to design and brand an alcoholic beverage can, including myriad alternative ways to convey a surf and beach theme, without using any features that comprise the Surfside Trade Dress—█████████████. *Id.* ¶¶ 101-103. This is clear from the many non-infringing designs (including ones identified by AB) presently in the marketplace doing just that. SUMF ¶ 104. *See Ideal Toy Corp. v. Plawner Toy Mfg. Corp.*, 685 F.2d 78, 81 n.4 (3d Cir. 1982) (affirming finding of non-functionality of Rubik's Cube trade dress given the "wide variety of colors, shapes, and markings which could be used to differentiate the faces of a cube puzzle" finding "the possible trade dress variations are limited only by the designers' imaginations."); *Am. Bev.*, 936 F. Supp. 2d at 588 ("Demonstrating the presence of alternative designs can be a significant factor

in finding that claimed elements are not functional.") (cleaned up) (internal citation omitted).

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████. SUMF ¶¶ 98-100. ████

████████████████████████████████████████████████

████████████████████████████████████████████████

*Id.* ¶¶ 101-103.

At bottom, Stateside is not seeking to prevent AB from promoting a surf and/or a beach theme with its RTD cocktail. Stateside merely seeks to protect its tremendously valuable and uniquely distinct Surfside Trade Dress. *See McNeil III*, 566 F. Supp. 2d at 393 (finding no functionality where plaintiff sought an "injunction preventing [defendant] from using packaging that is confusingly similar to [plaintiff's] packaging," not a general injunction "from using the color yellow, from depicting food and beverages on its packaging, or from distributing its products in packaging of a certain size and shape"). There is no competitive need for AB to use or copy the Surfside Trade Dress other than to free ride off the tremendous goodwill embodied in that dress.

## C.    A likelihood of confusion exists between the parties' can designs.

A likelihood of confusion exists when consumers viewing the defendant's trade dress would likely assume that the product it represents is associated in some way with the source of a different product identified by the plaintiff's trade dress. *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 211 (3d Cir. 2000). Several different types of actionable confusion exist. The first—and most common—is "point-of-sale confusion, which occurs or remains at the time of purchase." *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC (McNeil II)*, 511 F.3d 350, 358 (3d Cir. 2007) (citation omitted). Another is "initial interest confusion, which is 'confusion that creates initial customer interest, even though no actual sale is finally completed as a result of the confusion.'" *Id.* at 357

(citation omitted). Yet another is post-sale confusion, which "presumes that 'the senior users potential purchasers or ongoing customers might mistakenly associate the inferior quality work of the junior user with the senior user and, therefore, refuse to deal with the senior user in the future.'" *Gucci Am. Inc. v. Daffy's, Inc.*, 354 F.3d 228, 234 (3d Cir. 2003) (quoting *Acxiom Corp. v. Axiom, Inc.*, 27 F. Supp. 2d 478, 497 (D. Del. 1998)). Each theory applies here.

Irrespective of the type of confusion alleged, courts in the Third Circuit consider the following factors assess infringement: (1) the degree of similarity between the marks, (2) the strength of the plaintiff's mark, (3) consumer care and attention when making a purchasing decision, (4) the length of time the defendant has used its mark without evidence of actual confusion, (5) the defendant's intent in adopting its mark, (6) evidence of actual confusion, (7) whether the parties' goods are marketed through the same trade channels and advertised through the same media, (8) the extent to which the targets of the parties' sales efforts are the same, (9) the relationship of the parties' goods in the minds of consumers because of the similarity of function, and (10) other facts suggesting that the consuming public might expect the prior owner to expand into the defendant's market. *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983). All *Lapp* factors should be considered and no single factor is determinative. *Checkpoint Sys., Inc. v. Check Point Soft. Techs., Inc.*, 269 F.3d 270, 280 (3d Cir. 2001). The application of these factors weighs decidedly for Stateside.

### 1.    The parties' can designs are similar.

"The single most important factor in determining likelihood of confusion is trade dress similarity." *McNeil II*, 511 F.3d at 359 (quoting *A&H Sportswear*, 237 F.3d at 216) (cleaned up). Typically, the proper inquiry when comparing two trade dresses is whether they create the same overall impression when separately viewed. *McNeil II,* 511 F.3d at 359. But if buyers normally see products displayed together—as here (*see infra* Section IV.C.3)—a side-by-side comparison is appropriate. *Id.* "If the overall impression created by the [trade dress] is essentially the same, 'it is very probable that

17

the marks are confusingly similar.'" *Checkpoint Sys.*, 269 F.3d at 281 (quoting *Opticians Ass'n of Am. v. Indep. Opticians of Am.,* 920 F.2d 187, 195 (3d Cir. 1990)).

The Skimmers can design copies each element of the Surfside Trade Dress and mimics the overall appearance of Stateside's Surfside beverages, creating the same overall commercial impression. Still, AB contends that the Skimmers can differs because it features a different brand name, a bird above that brand name, different sun designs, and a chevron in the colored bands. *See* ECF No. 37 at 6-7, 10-11, ¶¶ 5, 31. These are distinctions without a difference.

The Western District of Pennsylvania's decision in *Am. Bev.* is instructive on that point. There, the court was tasked with comparing the following packaging designs:



*Am. Bev.*, 936 F. Supp. 2d at 604. Despite readily apparent differences in various aspects of the designs, the court nonetheless "conclude[d] that all three give largely the same overall impression." *Id.* at 604. In so doing, the court offered a series of pertinent observations about the designs' overall similarity:

- Each "is of an hourglass-shaped package with three distinct partitions." *Id.*

- Despite differences in size, "all three pouches share a solid-color band with instructions related to freezing and serving." *Id.*

- Each design featured "a large band that comprises most of the center of the package" that depicted a "centrally-located glass with a frozen beverage in it, surrounded by fruit." *Id.*

- The respective brand names—even though they differed—were placed "in nearly the same place" "above the glass" on all three designs." *Id.* at 604-05.

- The prominent use of the word "ALCOHOL" on all three packages "add[ed] to the shared overall impression." *Id.*

- The three partitions were "nearly the same size" on all three designs. *Id.* at 605.

The defendants urged the court to focus on multiple design differences. *See id.* But the court declined, finding that such differences did not "contribute meaningfully to the overall visual impression of the packaging" given the similarities listed above. *Id.* The defendants also argued that the use of their respective well-known brand names (Parrot Bay and Smirnoff) "remove[d] any likelihood of confusion." *Id.* But the court rejected that argument, finding that a brand name can only diminish likely confusion where "consumers exercise some care in purchasing the product," and "RTD frozen cocktails are exactly the kind of inexpensive, consumable impulse purchase for which consumers exercise little or no care before purchasing." *Id.*

This case is on all fours with *Am. Bev.* in multiple respects. **First**, the parties' cans are identically shaped and share three distinct partitions: (1) a stylized gradient design on the bottom third of the can comprised of layered color-shifting bands, (2) a white background overlayed with a sun design and the product trademark in the top two thirds of the can, and (3) a colored rim around the top of the can drawn from the color scheme of the bottom of the can. **Second**, both designs feature a large, white band that comprises most of the center of the cans that depict a centrally located sun. **Third**, the respective brand names—Surfside and Skimmers—are placed in the same location on the can, overlaying the sun in both instances. **Fourth**, both designs feature the prominent use of the word "VODKA." **Fifth**, the three partitions are nearly the same size. SUMF ¶¶ 9, 93.

Just as in *Am. Bev.*, these similarities more than suffice to create a nearly identical commercial impression. And the minute differences highlighted by AB fare no better in differentiating those designs than the "minor and subtle" differences raised in *Am. Bev.*

Indeed, people have already commented in articles, posts, communications, and podcasts that

19

the Skimmers can design looks "nearly identical," "eerily similar," and "nearly indistinguishable" to the Surfside Trade Dress, ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████ SUMF ¶¶ 143-151.

### 2. The parties' products are identical and are distributed through the same channels of trade.

This factor requires the Court to determine "whether buyers and users of each parties' goods are likely to encounter the goods of the other, creating an assumption of common source affiliation or sponsorship." *Checkpoint Sys.*, 269 F.3d at 286 (citing *Fisons Horticulture, Inc. v. Vigoro Indus.*, 30 F.3d 466, 481 (3d Cir. 1994)). The parties' beverages are the same—down to the alcohol type and flavors. SUMF ¶¶ 1, 7, 71-72, 108. Unsurprisingly, they often appear *right next to each other* on store shelves and in the same retailers and venues. *Id.* ¶¶ 116-119. ███████████████████████████████████

████████████████████████████████████████████████████████████████████

█████. *Id.* ¶ 121.

Given the identity of the goods and their proximity in the marketplace, this factor heavily favors likely confusion. *See Am. Bev.*, 936 F. Supp. 2d at 608 (finding two RTD cocktails sold through overlapping retailers favored likely confusion). Indeed, other courts have weighed this factor in favor of a likelihood of confusion when comparing products that are far less similar. *See Fisons Horticulture*, 30 F.3d at 481 (collecting cases, including *Alfred Dunhill of London, Inc. v. Kasser Distillers Prods. Corp.*, 350 F. Supp. 1341 (E.D. Pa. 1972) (finding a close relationship between pipe tobacco and bar accessories with scotch whiskey)).

### 3. Stateside and AB advertise through the same channels.

"[T]he greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion." *Acxiom Corp.*, 27 F. Supp. 2d at 502 (citing *Estate of Presley v. Russen*, 513 F. Supp. 1339,

20

1369 (D.N.J. 1981)). Here, the advertising could not be more similar. Surfside and Skimmers leverage a beach and outdoor theme in their marketing. SUMF ¶ 127. And they are often advertised and promoted side-by-side and/or in the same locations. *Id.* ¶¶ 118-119, 130. In fact, in at least one instance, the beverages were promoted in the *same advertisement*. *Id.* ¶ 132.

### 4. The Surfside Trade Dress is strong.

A trade dress' strength directly affects the likelihood that consumers will be confused as to the source of products bearing a similar dress. Strength includes both "[d]istinctiveness on the scale of trademarks" and "[c]ommercial strength, or marketplace recognition." *Fisons Horticulture*, 30 F.3d at 479. "A strong trademark is thus one that carries widespread, immediate recognition that one producer (even if unknown) is associated with the mark, and so with the product." *Versa Prods. Co. v. Bifold Co.*, 50 F.3d 189, 203 (3d Cir. 1995). "If a second comer adopts a mark [or trade dress] substantially identical to a strong mark, there is a correspondingly high likelihood that consumers will mistakenly associate the newcomer's product with the owner of the strong mark." *Id.*

As detailed above (*supra* Section IV.A.1), the Surfside Trade Dress is inherently distinctive, weighing in favor of strength. *See Am. Bev.*, 936 F. Supp. 2d at 605 (trade dress' inherent distinctiveness weighed in favor of finding it strong). It is also commercially strong. As shown above (*supra* Section IV.A.2), Surfside beverages have enjoyed significant commercial success, including extraordinary sales and exponential growth over five years of use (and earlier), wide-ranging and impactful nationwide advertising prominently promoting the Surfside Trade Dress (including strategic and effective use of the trade dress elements on merchandise), high-profile brand partnerships with major sports teams, and unsolicited media attention and praise. *See McNeil Nutritionals, LLC v. Heartland Sweeteners LLC (McNeil I)*, 512 F. Supp. 2d 217, 232 (E.D. Pa. 2007), *affirmed in part and rev'd in part on other grounds*, 511 F.3d 350 (3d Cir. 2007) (trade dress strong based on sales success (e.g., $410 million in one year), significant advertising spend (e.g., $250 million), and significant advertising); *Am. Bev.*, 936 F. Supp.

21

2d at 605 (trade dress strong because it acquired secondary meaning); SUMF ¶¶ 28-57.

### 5. Consumers are not sophisticated and exercise minimal care when purchasing the parties' products.

The lower the degree of care and attention consumers exercise when making a purchase, the greater the likelihood of confusion. *Am. Bev.*, 936 F.Supp.2d at 606 ("Based upon the lack of care exercised by consumers when making an impulse purchase, the court finds that this factor weighs in favor of finding a likelihood of confusion."). When items are generally inexpensive, consumers are less likely to devote much time to the purchasing decision. *See Versa Prods. Co.*, 50 F.3d at 204 ("Inexpensive goods require consumers to exercise less care in their selection than expensive ones."); *Century 21 Real Estate Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 248 (3d Cir. 2005) (Fisher, J., dissenting) ("The cheaper the goods or the less sophisticated the consumers, the more likely that a use may confuse."). Again, *Am. Bev.* provides helpful guidance. There, the court found that the parties' frozen RTD cocktails were "impulse purchase[s]" due to their "low barrier to purchase" and specific marketing techniques that made them "easy to access" (i.e., they were "placed at the ends of aisles and in large dump bins, which allow[ed] for a quick, grab-and-go type of purchase"). *Am. Bev.*, 936 F. Supp. 2d at 606. Consequently, the court found that "consumers do not exercise a great deal of care in selecting which product to buy." *Id.*

So too here. Like the products in *Am. Bev.*, both parties' products are inexpensive. SUMF ¶¶ 118-121.



. *Id.* ¶¶ 123-124. Moreover, as alcoholic beverages are sold in bars and at stadiums/events where consumers are drinking, consumer care is even lower.

With little to no care or deliberation prior to purchase, consumers are all the more likely to confuse AB's Skimmers product for Stateside's Surfside products; to falsely believe that Skimmers is

put out, sponsored, endorsed, or approved by Stateside; and/or that the parties or their products are otherwise affiliated or associated. *See Am. Bev.*, 936 F. Supp. 2d at 606 ("Based upon the lack of care exercised by consumers when making an impulse purchase, the court finds that this factor weighs in favor of finding a likelihood of confusion."); SUMF ¶ 125.

### 6.    Actual confusion has already arisen.

It is well settled that a plaintiff need not present evidence of actual confusion to prove a likelihood of confusion. *See Versa Prods. Co.*, 50 F.3d at 205 ("[P]roof of actual confusion is not required for a successful claim of trade dress infringement under the Lanham Act."); *Fisons Horticulture*, 30 F.3d at 472 ("Proof of actual confusion is not necessary; likelihood of confusion is all that need be shown."). That is particularly true where the infringing product has only been on the market for a short period of time and on a limited scale, as with AB's Skimmers beverage (released in around April 2025). *See Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 422 (6th Cir. 2012) ("Here, the [accused] product was sold for a short time and in limited quantities; under these circumstances, it is reasonable that no meaningful evidence of actual confusion was available."); *Eli Lilly & Co. v. Nat. Answers, Inc.*, 233 F.3d 456, 464 (7th Cir. 2000) (when the challenged product is new on the market "it is not surprising that [plaintiff] cannot identify customers who were actually confused . . . ."). Where present, however, actual confusion evidence is "highly probative of the likelihood of confusion." *Checkpoint Sys.*, 269 F.3d at 291. Accordingly, "very little proof of actual confusion [is] necessary to prove the likelihood of confusion." *Country Floors, Inc. v. P'ship Composed of Gepner and Ford*, 930 F.2d 1056, 1064 (3d Cir. 1991) (citation omitted); *see also Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 720 (3d Cir. 2004) ("the rarity of such evidence [of actual confusion] makes even a few incidents 'highly probative of the likelihood of confusion'") (citation omitted). This makes sense, as the Third Circuit has "recognized that it is difficult to find evidence of actual confusion because many instances are unreported." *Checkpoint Sys.*, 269 F.3d at 291.

Despite these difficulties, the short period of coexistence, and the limited geographic distribution and marketing for Skimmers, Stateside has *already* discovered multiple instances of confusion resulting from the similar Skimmers Trade Dress. SUMF ¶¶ 138-142. (*See supra* Section II.D.) This weighs heavily in favor of finding a likelihood of confusion. *See Acxiom*, 27 F. Supp. 2d at 500-501 (finding evidence of actual confusion favored finding of likely confusion); *S&P Global Inc. v. S&P Data LLC*, 619 F. Supp. 3d 445, 462 (D. Del. 2022) (finding three incidents of confusion favored finding of likely confusion).[2]

### 7.    AB created the Skimmers can design with the intent to copy the Surfside Trade Dress and confuse consumers.

While "[e]vidence of a defendant's intent is not a prerequisite for finding a Lanham Act violation; such evidence, however, weighs heavily in favor of finding a likelihood of confusion." *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 187 (3d Cir. 2010); *see also Versa Prods.*, 50 F.3d at 205 ("A defendant's intent to confuse or deceive consumers as to the product's source may be highly probative of likelihood of confusion."). Given the near-identical appearance of the parties' can designs, AB's intent to create a copy of Stateside's Surfside Trade Dress is clear.



. SUMF ¶¶ 61-69.

. *Id.* ¶¶ 95, 107.

*Id.* ¶¶ 81-88.

---

[2] Although not needed for summary judgment, Stateside's expert conducted a consumer survey that supports what the evidence bears out—netting a 16% confusion rate (SUMF ¶ 142). The Third Circuit has explained that a 15.5% confusion rate demonstrates "a likelihood of substantial consumer confusion." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.*, 290 F.3d 578, 594 (3d Cir. 2002).



*Id.* ¶¶ 81-94.

*Id.* ¶ 111.

This factor therefore favors a likelihood of confusion. *Paddington Corp. v. Attiki Imps. & Distribs.,* 996 F.2d 577, 587 (2d Cir. 1993) (finding bad faith intent where defendant "was of course intimately familiar with its trade dress" and "[t]he similarities between the No. 12 and #1 Ouzo dresses are so striking that it is hard to imagine how [they] could have come up with the dress for #1 Ouzo without intentional copying").

### 8.    On balance, each *Lapp* factor favors likely confusion.

While weighing the *Lapp* factors is not a rote counting exercise, here, each and every *Lapp* factor overwhelmingly favors the likelihood of confusion. Beginning with "the single most important" of the ten factors—similarity of the trade dresses, *McNeil II*, 511 F.3d 350, 359 (3d Cir. 2007)—the Skimmers Can Design conveys a nearly identical commercial impression to the Stateside Trade Dress. What's more, the products are identical; they are marketed and sold through the same trade channels in the same way in close proximity to one another (often side-by-side); the products are inexpensive and subject to purchase on impulse; AB adopted its Skimmers Can Design with the bad-faith intent to siphon the goodwill from the Surfside Trade Dress tirelessly cultivated by Stateside; and AB has succeeded in doing so, having already caused actual marketplace confusion. With the *Lapp* factors so heavily skewed for Stateside, confusion is not only likely—it is inevitable.

## V.    CONCLUSION

For the foregoing reasons, Stateside respectfully requests that its motion for summary judgment be granted as to both counts of the Complaint, namely, federal trade dress infringement and unfair competition under the Lanham Act (15 U.S.C. § 1125(a) and Pennsylvania common law.

Dated: July 9, 2026

Respectfully submitted,

 /s/ *Molly Reilly*
Susan M. Valinis
Identification No. 86685
Molly Reilly
Identification No. 313713
REILLY, MCDEVITT & HENRICH, PC
The Widener Building
One South Penn Square
Suite 401
Philadelphia PA 19107
(215) 972-5200
svalinis@rmh-law.com
mreilly@rmh-law.com

Douglas A. Rettew (*pro hac vice*)
Patrick J. Rodgers (*pro hac vice*)
Maxime I. Jarquin (*pro hac vice*)
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
901 New York Avenue NW
Washington, DC 20001-4413
(202) 408-4000
doug.rettew@finnegan.com
patrick.rodgers@finnegan.com
maxime.jarquin@finnegan.com

Morgan E. Smith (*pro hac vice*)
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
3300 Hillview Ave,
Palo Alto, CA 94304
(650) 849-6600
morgan.smith@finnegan.com

*Counsel for Plaintiff Stateside Brands LLC*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this the 9th day of July 2026, I caused the foregoing to be filed electronically with the Clerk of the Court using the ECF system and is available for viewing and downloading from the ECF system, and a Notice of Electronic Case Filing was served upon all counsel of record registered with the ECF system.

/s/ *Molly Reilly*
Susan M. Valinis
Identification No. 86685
Molly Reilly
Identification No. 313713
REILLY, MCDEVITT & HENRICH, PC
The Widener Building
One South Penn Square
Suite 401
Philadelphia PA 19107
(215) 972-5200
svalinis@rmh-law.com
mreilly@rmh-law.com